USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __5/2/2023__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
ERICA NAPOLITANO,                                    :
                                                     :
                    Plaintiff,                       :        **OPINION &**
                                                     :        **ORDER**
                                                     :
         -against-                                   :        21-CV-10470 (JLC)
                                                     :
KILOLO KIJAKAZI,                                     :
Acting Commissioner, Social Security                 :
Administration                                       :
                    Defendant.                       :
                                                     :
------------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

Erica Napolitano seeks judicial review of a final determination by Kilolo
Kijakazi, the Acting Commissioner of the Social Security Administration (the
"Commissioner"), denying her application for disability insurance benefits and
supplemental security income under the Social Security Act.  Napolitano has moved
for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil
Procedure, and the Commissioner has cross-moved for judgment on the pleadings
pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.  For the reasons set
forth below, Napolitano's motion is denied, and the Commissioner's cross-motion is
granted.

# I.    BACKGROUND

## A. Procedural History

Napolitano filed a Title II application for a period of disability and disability insurance benefits on September 20, 2019, alleging a disability onset date of August 1, 2018.  Administrative Record ("AR"), Dkt. No. 8, at 10.[1]  The Social Security Administration ("SSA") initially denied Napolitano's claims on January 21, 2020, and again after reconsideration on May 27, 2020.  *Id*.  Napolitano then submitted a request for a hearing on June 11, 2020.  *Id*.  Napolitano, Yocasta Duran (Napolitano's counsel), and a vocational expert appeared at a telephone hearing before Administrative Law Judge ("ALJ") Vincent M. Cascio on November 9, 2020.  *Id*. at 33.  On January 13, 2021, in a 12-page decision, the ALJ found Napolitano not disabled under sections 216(i) and 223(d) of the Social Security Act and denied her claims.  *Id*. at 10–21.  Napolitano sought review of the ALJ's decision by the Appeals Council, which denied her request on October 14, 2021.  *Id*. at 1.

Napolitano timely commenced this action on December 7, 2021, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  Complaint, Dkt. No. 1.  The Commissioner answered Napolitano's complaint by filing the administrative record on June 2, 2022.  Dkt. No. 8.  On September 30, 2022, Napolitano moved for judgment on the pleadings and submitted a memorandum of law in support of her motion.  Notice of Motion for Judgment on

---

[1] The page numbers refer to the sequential numbering of the Administrative Record provided on the bottom right corner of the page, not the numbers produced by the Electronic Case Filing ("ECF") System.

Pleadings, Dkt. No. 13; Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings ("Pl. Mem."), Dkt. No. 14.  The Commissioner cross-moved for judgment on the pleadings on December 13, 2022, and submitted a memorandum of law in support of her cross-motion.  Notice of Cross-Motion for Judgment on the Pleadings, Dkt. No. 20; Memorandum of Law in Support of the Commissioner's Cross-Motion for Judgment on the Pleadings and in Opposition to Plaintiff's Motion for Judgment on the Pleadings ("Def. Mem."), Dkt. No. 21. Napolitano submitted a reply letter on January 4, 2023.  Response to Cross-Motion for Judgment on the Pleadings and in Response to Plaintiff's Motion ("Pl. Response"), Dkt. No. 24.

### B. The Administrative Record

#### 1. Napolitano's Background

Napolitano was born on September 26, 1979.  AR at 33.  She received a high school diploma and completed two years of college education.  *Id*. at 38.  At the time of the hearing, she was 41 years old and lived with her husband.  *Id*.  She resides in Putnam Valley, New York.  *See* Dkt. No. 1.[2]  On September 7, 2017, she underwent surgery to remove a path grade 1 meningioma, a type of benign brain tumor.  *Id*. at 291, 337, 351.[3]  A post-op MRI on September 21, 2017 suggested no residual

---

[2] At the time of her filing the complaint, Napolitano recorded that she resides in Putnam Valley, New York.

[3] Meningioma is the most common benign brain tumor.  *See Meningiomas*, AM. ASS'N OF NEUROLOGICAL SURGEONS, https://www.aans.org/en/Patients/Neurosurgical-Conditions-and-Treatments/Meningiomas (last visited Apr. 24, 2023).

disease. *Id.* at 352.  Napolitano alleges that she has suffered headaches, neuropathy in her hands and feet, major neurocognitive disorder, depressive disorder, and anxiety disorder since the surgery. *Id.* at 290.  She worked as an admissions director in various health care settings prior to her surgery, but she has not worked since. *Id.* at 38–39.

### 2.  Relevant Medical Evidence

Napolitano and the Commissioner have each provided a summary of the medical evidence contained in the administrative record. *See* Pl. Mem. at 5–10;[4] Def. Mem. at 6–12.  "The Court adopts these summaries, which do not materially conflict with each other, as accurate and complete for the purpose of considering the issues raised in this suit, except to the extent [it] discuss[es] additional records below." *Marinez v. Comm'r of Soc. Sec.*, 269 F. Supp. 3d 207, 210 (S.D.N.Y. 2017).  The Court will discuss the medical evidence pertinent to the adjudication of this case in Section II(B) of this opinion.

### 3.  ALJ Hearing

#### a.  Napolitano's Testimony

On November 9, 2020, Napolitano, represented by Duran, appeared via telephone conference before the ALJ. *Id.* at 33.  Vocational Expert ("VE") Marian Marracco also appeared and testified at the hearing. *Id.* at 35.

---

[4] Because Napolitano's memorandum of law is not paginated, the citations refer to the page numbers generated by ECF.

Napolitano testified that prior to her surgery, she worked as an admissions director at Montefiore Medical Center in the Bronx for 13 years, and then for one year at a nursing home. *Id.* at 39. She had been working at a gastroenterology center for a month when her tumor was discovered. *Id.* Her work as an admissions director for the two facilities generally required the same work—talking to doctors, residents, insurance companies, filling out paperwork, and sometimes transporting patients. *Id.* at 39–40. She testified that other than her husband and her mother's financial help, she has had no other source of income and has received no disability insurance since she stopped working. *Id.* at 40.

When asked which doctors she was currently seeing, Napolitano testified to seeing her primary care physician every three months and also seeing her neurologist. *Id.*[5] She reported the following in describing her daily activities: she gets headaches every morning and wakes up with nausea and dizziness. *Id.* at 41. She can walk a radius of three or four blocks before her right foot starts to cramp, and she cannot sit for more than 20 minutes if her leg is not elevated. *Id.* When standing, she tries not to lean or put any pressure on her right side. *Id.* She has no trouble picking up a coin or pencil from the table or writing her name, but cannot make a tight fist with her right hand. *Id.* at 42. She also has no trouble reaching over her head. *Id.* at 42–43. She testified to being on multiple medications for headaches, an overactive bladder, and panic attacks. *Id.* at 43. She tries not to go anywhere after taking her medications because they make her tired and dizzy. *Id.*

---

[5] Napolitano did not testify as to how often she sees her neurologist.

She does not go for psychological treatment anywhere, but received Klonopin, "Pardoxine [sic,]" and Diazepam from her primary care physician. *Id*. She stated her psychological issues affect "everything" and that she does not want to see people. *Id*. at 44.

When describing her daily chores, Napolitano testified that she is able to do some light cooking and has no difficulties dressing or bathing herself. *Id*. at 44, 48. She stated a gallon of milk is heavy to lift on her right side. *Id*. She is able to vacuum and mop; however, pressing the button on the Swiffer causes her right hand to cramp, her arm to hurt, and her fingers to turn blue. *Id*. at 44–45. She is also able to go shopping, make coffee, do laundry, and visit her mother. *Id*. at 45. She reported she cannot drive at night because the lights hurt her eyes. *Id*. at 46. The ALJ also asked her to identify the heaviest thing she had to lift or carry for her position as an admissions director, to which she responded, "a person," when she assisted in lifting patients. *Id*. at 48.

Napolitano testified that light and sound bother her, and the incision area on her head hurts and can be affected by the weather. *Id*. She has difficulty remembering things, but keeps calendars on the refrigerator, in her room, on her phone, and keeps sticky notes on the counter as well. *Id*. at 46–47. She admitted she has no issue being punctual and never misses appointments. *Id*. at 47. She has no problems making decisions. *Id*. If she has to deal with changes in routine, she gets anxiety and sweats profusely—she does not like going to places if she does not have to. *Id*.

6

Napolitano stated she tries not to kneel because it hurts and cramps her feet.
*Id.* at 47–48.  She does not bend, and if she squats for too long, her feet hurt.  *Id.* at
48.  She does not use any assistive devices for her conditions.  *Id.*

### b.  VE's Testimony

The ALJ asked the Vocational Expert, Marracco, to assume a hypothetical
person of Napolitano's age, educational level, and work history with the following
abilities and limitations:

> [A] residual functional capacity for a full range of
> sedentary work except the person can occasionally climb
> ramps and stairs.  Cannot climb ladders, ropes, or
> scaffolds.  Can occasionally balance, stoop, crouch, crawl,
> or kneel.  The person must avoid unprotected heights and
> hazardous machinery.  The person must avoid bright
> lights.  The person can frequently handle and finger with
> the bilateral upper extremities.  And the person can
> frequently operate bilateral foot controls.  The person can
> be exposed to no more than a moderate noise level.  And
> the person can understand, remember, carry out simple,
> routine, repetitive work-related tasks.

*Id.* at 51–52.  Marracco testified that given the abilities and limitations provided,
the hypothetical individual could not perform Napolitano's previous job as an
admissions director because the simple routine limitation eliminates the work.  *Id.*
at 52.  Marracco then identified three jobs in the national economy that the
hypothetical individual could hold: document preparer, clerk for customer service,
and information clerk.  *Id.*

The ALJ posed a second hypothetical, adding the limitation that the
individual in an eight-hour workday could sit two hours, stand one hour, walk one
hour, and would be off task 15 percent of the workday.  *Id.* at 53.  Marracco

7

responded that this limitation is preclusive of employment. *Id.* Specifically, standing, walking, and sitting less than eight hours is commonly referred to as less than sedentary, which is preclusive of employment. *Id.* Additionally, 15 percent of time spent off task at the unskilled level is also preclusive of employment. *Id.*

The ALJ asked Marracco to clarify any inconsistencies or conflicts between her answers and the Dictionary of Occupational Titles ("DOT"). *Id.* Marracco explained that the DOT does not address the meaning of "less than sedentary" or the percentage of time spent off task, but her answers were based on her professional credentials. *Id.* Otherwise, everything else is addressed in the DOT. *Id.*

Duran then cross-examined Marracco. *Id.* at 54. Duran added more limitations to hypothetical number one—the person would sit and stand every twenty minutes for five minutes, could only work in a quiet noise environment, and could occasionally handle and finger—and asked if the previously identified DOT jobs could still be performed. *Id.* Marracco answered in the negative, adding that the handling and fingering limitation would eliminate the jobs. *Id.*

The ALJ followed up on Duran's questions and asked Marracco if "occasional" is substituted for "frequent" handling and fingering in the first hypothetical, whether past relevant work would be precluded, to which Marracco responded that it would. *Id.* The ALJ then asked whether there would be any jobs in the national economy with occasional rather than frequent handling. *Id.* Marracco replied that

the job of surveillance system monitor, which is less than occasional handling, and simple and routine, might be the only one. *Id* at 55.

Duran then asked whether the job of surveillance system monitor would be exposed to any lights, including excessive lights. *Id*. at 56. Marracco responded it would be a subdued light, not a bright light, and that the workers are looking at a computer screen and a television monitor. *Id*. at 56–57. Duran next asked if two additional limitations—a quiet noise environment and a sit and stand option every 20 minutes for 5 minutes without being able to stay on task—would still eliminate this job. *Id*. at 57. Marracco answered that the requirements to sit and stand and not remain on task would be preclusive of employment. *Id*. at 57–58.

At the conclusion of her testimony, the ALJ asked Marracco to identify the maximum off-task percentage and number of absences that an employer would accept for a level two sedentary job. *Id*. at 58. Marracco responded that, at the unskilled level, an employer would accept no more than 10 percent on an accumulative basis and no more than once a month of absences. *Id*. She further added that as the skill level increases, so do these allowances. *Id*.

### 4. The ALJ's Decision

On January 13, 2021, in a 12-page decision, the ALJ determined that Napolitano was not disabled from August 1, 2018 through the date of the decision. *Id*. at 10–21. At step one of the five-step inquiry, he found that she had not engaged in substantial gainful activity since August 1, 2018, the alleged onset date. *Id*. at 12. At step two, he found that she had the following severe impairments: "grade I

meningioma, status-post total resection (September 2017); migraine headaches; neuropathy; depression; and anxiety." *Id.* He determined that in combination, these impairments "significantly limit the ability to perform basic work activities." *Id.*

At step three, after considering Napolitano's physical and mental impairments, and applying the required "special technique" in assessing her mental impairments, the ALJ concluded that she did not have "an impairment or combination of impairments" that met the severity of a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id.* at 12–14. Specifically, he determined that she did not meet the requirements for Listing 11.05 because there was no evidence of disorganization of motor functioning or marked limitations in physical and mental functioning. *Id.* at 13. In so deciding, he found that "no acceptable medical source designated to make equivalency findings ha[d] concluded that the claimant's impairments medically equal a listed impairment." *Id.* In considering the severity of claimant's mental impairments, the ALJ looked to her ability to function—*i.e.* cook, drive, shop, conduct household chores, manage finances, and maintain relationships—and mental status examinations. *Id.* Thus, the ALJ similarly concluded that she did not have at least two "marked limitations" in physical or mental functioning or "one extreme limitation" in motor functioning, and therefore failed to satisfy the "paragraph B" criteria. *Id.*[6]

---

[6] The ALJ also concluded that the evidence failed to establish the presence of "paragraph C" criteria. *Id.* at 13.

10

Prior to evaluating step four, the ALJ determined Napolitano's residual functional capacity ("RFC"). *Id*. at 14–19. He found that while her "record documents the severe impairments . . . the medical record and [Napolitano's] own admissions in the record do not corroborate the level of incapacity alleged." *Id*. at 14. The ALJ declared it was "reasonable to conclude that the claimant is capable of performing a wide range of sedentary work." *Id*. at 14–15. He noted that while Napolitano's subjective reports consisted of neuropathic pain and numbness to the hands and feet, the x-rays of her hands and feet were negative, and her MRI scans of the lumbar spine provided no evidence of degenerative disease, nerve root compression, tumor recurrence, or residual disease. *Id*. at 15. Additionally, he observed that although she was prescribed Gabapentin to help with the neuropathic pain, she admitted to not taking the medication as recommended. *Id*.

Finally, the ALJ determined Napolitano's subjective allegations were "not wholly persuasive nor consistent with the evidence in the record." *Id*. at 17. Specifically, he found that her ability to drive "demonstrates concentration and persistence as well as an ability to deal with stress inherent in the operation of a motor vehicle," and displays the "attributes necessary to work effectively[,] . . . [an] ability to use hand and foot controls, . . . to turn one's head to consult mirrors, to back up and change lanes[,] to sit for continuous period of time[,] . . . [and] to bend and stoop to get into and out of the car." *Id*. He additionally emphasized that Napolitano showers and dresses herself, cooks and cleans, shops and does laundry, pays bills, counts change, uses the computer, and socializes. *Id*. at 17–18. The ALJ

11

concluded that the "record does not contain any non-conclusory opinions, supported by clinical or laboratory evidence, from treating or examining physicians indicating that the claimant is currently disabled." *Id.* at 18.

Based on the medical evidence, including findings on examinations and her subjective complaints, with respect to physical limitations, the ALJ concluded that Napolitano has the RFC to perform sedentary work, except:

> [she] can occasionally climb ramps and stairs, but cannot climb ladders[,] ropes[,] or scaffolds. She can occasionally balance, stoop, crouch, crawl, or kneel and must avoid unprotected heights and hazardous machinery. [She] must avoid bright lights[. She] can frequently handle and finger with the bilateral upper extremities and can frequently operate bilateral foot controls. [She] can be exposed to no more than a moderate noise level[,] and she can understand, remember[,] and carry out simple, routine[,] repetitive work[-]related tasks.

*Id.* at 14. He observed that while treatment records establish residual fatigue and neuropathic pain, her physical examinations demonstrate a normal gait with normal motor strength and no sensory deficits. *Id.* at 16. While acknowledging her conditions may cause some pain, weakness, and balance issues, he determined that "the evidence does not support greater restriction than the residual functional capacity for sedentary work" and that she "can frequently handle and finger with the bilateral upper extremities and can frequently operate bilateral foot controls." *Id.*

With respect to mental abilities, the ALJ concluded that "the totality of the evidence" reveals that Napolitano can "understand and remember instructions and procedures, is able to maintain adequate attention to complete ordinary work tasks

in an ongoing basis and is able to independently sustain a routine over time, interact appropriately to meet work needs, and adapt to work related changes and make work related decisions." *Id.* at 17. The ALJ summarized that her "mental issues are not so severe that they interfere with her ability to perform simple and routine tasks" and that "[t]he evidence. . . shows . . . no more than moderate limitations in concentration, persistence or pace, and understanding, remembering or applying information . . . . [S]he is able to understand, remember[,] and carry out simple, routine[,] repetitive work[-]related tasks." *Id.* Finally, the ALJ provided an analysis of which physicians he found persuasive, which he found to be unpersuasive, and why. *Id.* at 15–19.

At step four, the ALJ found that Napolitano was unable to perform any past relevant work. *Id.* at 19. At step five, after considering the VE's testimony, the ALJ adopted the VE's determination that Napolitano could perform three jobs: document preparer, customer service clerk, and information clerk. *Id.* at 20. Accordingly, the ALJ concluded that Napolitano was not disabled. *Id.* at 21.

## II. DISCUSSION

### A. Legal Standards

#### 1. Judicial Review of the Commissioner's Decision

An individual seeking Social Security Disability benefits may obtain judicial review of a final decision of the Commissioner "in the district court of the United States for the judicial district in which the plaintiff resides." 42 U.S.C. § 405(g). The district court must determine whether the Commissioner's final decision

applied the correct legal standards and whether the decision is supported by

"substantial evidence." *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004).  "The

phrase 'substantial evidence' is a 'term of art' used throughout administrative law

to describe how courts are to review agency factfinding." *Biestek v. Berryhill*, 139 S.

Ct. 1148, 1152 (2019) (citation omitted).  "Substantial evidence means more than a

mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Ferraro v. Saul*, 806 F. App'x. 13, 14 (2d Cir.

2020) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)); *see also Biestek*,

139 S. Ct. at 1154.  "The agency's factual findings are conclusive in judicial review

of the benefits decision so long as they are supported by substantial evidence."

*Biestek*, 139 S. Ct. at 1152 (cleaned up).  "Under the substantial-evidence standard,

a court looks to an existing administrative record and asks whether it contains

'sufficient evidence' to support the agency's factual determinations. . . . [T]he

threshold for such evidentiary sufficiency is not high." *Id.* at 1154 (cleaned up).

The substantial evidence standard is a "very deferential standard of review."

*Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012).  The Court

"must be careful not to substitute its own judgment for that of the Commissioner,

even if it might justifiably have reached a different result upon a *de novo* review."

*DeJesus v. Astrue*, 762 F. Supp. 2d 673, 683 (S.D.N.Y. 2011) (quoting *Jones v.

Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)) (internal quotation marks and alterations

omitted).  Under the substantial evidence standard, "once an ALJ finds facts, [the

reviewing court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (citation omitted).

In weighing whether substantial evidence exists to support the Commissioner's decision, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Mongeur v. Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983)). On the basis of this review, the court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding . . . for a rehearing." 42 U.S.C. § 405(g). However, "[w]hen there are gaps in the administrative record or the ALJ has applied an improper legal standard, [the court has], on numerous occasions, remanded to the [Commissioner] for further development of the evidence." *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (quoting *Parker v. Harris*, 626 F.2d 225, 235 (2d Cir. 1980)) (alteration in original).

### 2. Commissioner's Determination of Disability

Under the Social Security Act, "disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also Colgan v. Kijakazi*, 22 F.4th 353, 357 (2d Cir. 2022). Physical or mental

impairments must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).  "'[T]he ALJ should consider not only whether Plaintiff was disabled at the time of the hearing, but also whether Plaintiff was entitled to disability benefits for any closed, continuous period . . . following the date of his claim.'"  *Love v. Kijakazi*, No. 20-CV-1250 (EK), 2021 WL 5866490, at *5 (E.D.N.Y. Dec. 10, 2021) (quoting *Williams v. Colvin*, No. 15-CV-144 (WMS), 2016 WL 3085426, at *4 (W.D.N.Y. June 2, 2016); *see also Milliken v. Saul*, No. 19-CV-9371 (PED), 2021 WL 1030606, at *9 (S.D.N.Y. Mar. 17, 2021) ("A 'closed period' of disability occurs where a claimant is found by the Commissioner to be disabled for a finite period of time which began and ended prior to the date of the agency's administrative determination of disability.").

In assessing a claimant's impairments and determining whether they meet the statutory definition of disability, the Commissioner "must make a thorough inquiry into the claimant's condition and must be mindful that 'the Social Security Act is a remedial statute, to be broadly construed and liberally applied.'"  *Mongeur*, 722 F.2d at 1037 (quoting *Gold v. Sec'y of H.E.W.*, 463 F.2d 38, 41 (2d Cir. 1972)). Specifically, the Commissioner's decision must consider factors such as: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and

16

(4) the claimant's educational background, age, and work experience." *Id*. (citations omitted).

### a. Five-Step Inquiry

"The Social Security Administration has outlined a 'five-step, sequential evaluation process' to determine whether a claimant is disabled[.]" *Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019) (citations omitted); 20 C.F.R. § 404.1520(a)(4). First, the Commissioner must establish whether the claimant is presently employed. 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is unemployed, the Commissioner goes to the second step and determines whether the claimant has a "severe" impairment restricting his or her ability to work. 20 C.F.R. § 404.1520(a)(4)(ii). If the claimant has such an impairment, the Commissioner moves to the third step and considers whether the medical severity of the impairment "meets or equals" a listing in Appendix One of Subpart P of the regulations. 20 C.F.R. § 404.1520(a)(4)(iii). If so, the claimant is considered disabled. *Id.*; 20 C.F.R. § 404.1520(d).

If the claimant alleges a mental impairment, the Commissioner must apply a "special technique" to determine the severity of the claimant's impairment at step two, and to determine whether the impairment satisfies Social Security regulations at step three. *See* 20 C.F.R §§ 404.1520a, 416.920a; *see also Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008). "If the claimant is found to have a 'medically determinable mental impairment,' the [Commissioner] must 'specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s),'

17

then 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c) of [Sections 404.1520a, 416.920a],' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation." *Velasquez v. Kijakazi*, No. 19-CV-9303 (DF), 2021 WL 4392986, at *18 (S.D.N.Y. Sept. 24, 2021) (quoting 20 C.F.R. §§ 404.1520a(b), (c)(3); *id.* §§ 416.920a(b), (c)(3)). "The functional limitations for these first three areas are rated on a five-point scale of none, mild, moderate, marked, or extreme, and the limitation in the fourth area (episodes of decompensation) is rated on a four-point scale of none, one or two, three, or four or more." *Id.* (cleaned up). If the claimant's impairment does not meet or equal a listed impairment, then the Commissioner continues to the fourth step and determines whether the claimant has the RFC to perform his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). Finally, if the claimant does not have the RFC to perform past relevant work, the Commissioner completes the fifth step and ascertains whether the claimant possesses the ability to perform any other work. 20 C.F.R. § 404.1520(a)(4)(v).

The claimant has the burden at the first four steps. *Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008). If the claimant is successful, the burden shifts to the Commissioner at the fifth and final step, where the Commissioner must establish that the claimant has the ability to perform some work in the national economy. *See, e.g., Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009).

### b. Duty to Develop the Record

"Social Security proceedings are inquisitorial rather than adversarial." *Sims v. Apfel*, 530 U.S. 103, 110–11 (2000). Consequently, "the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding." *Moran*, 569 F.3d at 112 (internal quotation marks omitted). As part of this duty, the ALJ must "investigate the facts and develop the arguments both for and against granting benefits." *Sims*, 530 U.S. at 111. Specifically, under the applicable regulations, the ALJ is required to develop a claimant's complete medical history. *Pratts*, 94 F.3d at 37 (citing 20 C.F.R. §§ 404.1512(d)–(f)). This responsibility "encompasses not only the duty to obtain a claimant's medical records and reports but also the duty to question the claimant adequately about any subjective complaints and the impact of the claimant's impairments on the claimant's functional capacity." *Peña v. Astrue*, No. 07-CV-11099 (GWG), 2008 WL 5111317, at *8 (S.D.N.Y. Dec. 3, 2008) (citations omitted).

Whether the ALJ has satisfied this duty to develop the record is a threshold question. Before determining whether the Commissioner's final decision is supported by substantial evidence under 42 U.S.C. § 405(g), "the court must first be satisfied that the ALJ provided plaintiff with 'a full hearing under the Secretary's regulations' and also fully and completely developed the administrative record." *Scott v. Astrue*, No. 09-CV-3999 (KAM) (RLM), 2010 WL 2736879, at *12 (E.D.N.Y. July 9, 2010) (quoting *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751,

755 (2d Cir. 1982)); *see also Rodriguez ex rel. Silverio v. Barnhart*, No. 02-CV-5782

(FB), 2003 WL 22709204, at *3 (E.D.N.Y. Nov. 7, 2003) ("The responsibility of an

ALJ to fully develop the record is a bedrock principle of Social Security law.") (citing

*Brown v. Apfel*, 174 F.3d 59 (2d Cir. 1999)).  The ALJ must develop the record even

where the claimant has legal counsel.  *See, e.g., Perez v. Chater*, 77 F.3d 41, 47 (2d

Cir. 1996).  Remand is appropriate where this duty is not discharged.  *See, e.g.,*

*Moran*, 569 F.3d at 114–15 ("We vacate not because the ALJ's decision was not

supported by substantial evidence but because the ALJ should have developed a

more comprehensive record before making his decision.").

### c.  Evaluation of Medical Opinion Evidence

"Regardless of its source, the ALJ must evaluate every medical opinion in

determining whether a claimant is disabled under the [Social Security] Act." *Peña*

*ex rel. E.R. v. Astrue*, No. 11-CV-1787 (KAM), 2013 WL 1210932, at *14 (E.D.N.Y.

Mar. 25, 2013) (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)) (internal quotation

marks omitted).  For SSI and SSDI applications filed prior to March 27, 2017, SSA

regulations set forth the "treating physician rule," which required an ALJ to give

more weight to the opinions of physicians with the most significant clinical

relationship with the plaintiff.  20 C.F.R. §§ 404.1527(c)(2); 416.927(d)(2); *see also,*

*e.g., Taylor v. Barnhart*, 117 F. App'x 139, 140 (2d Cir. 2004).  Under the treating

physician rule, an ALJ was required to give "good reasons," 20 C.F.R. §

404.1527(c)(2), if he determined that a treating physician's opinion was not entitled

to "controlling weight," or at least "more weight," than the opinions of non-treating

and non-examining sources.  *Gonzalez v. Apfel*, 113 F. Supp. 2d 580, 588 (S.D.N.Y. 2000).  In addition, a consultative physician's opinion was generally entitled to "little weight."  *Giddings v. Astrue*, 333 F. App'x 649, 652 (2d Cir. 2009).

However, in January 2017, the SSA revised its regulations regarding the evaluation of medical opinion for claims filed on or after March 27, 2017 (such as Napolitano's claim in this case).  *See* REVISIONS TO THE RULES REGARDING THE EVALUATION OF MEDICAL EVIDENCE, 82 Fed. Reg. 5844, 5869–70 (Jan. 18, 2017).  "In implementing new regulations, the SSA has apparently sought to move away from a perceived hierarchy of medical sources."  *Velasquez*, 2021 WL 4392986, at *19 (citing 82 Fed. Reg. 5844).  The new regulations state that an ALJ need "not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources."  *Id.* (quoting 20 C.F.R. §§ 404.1520c(a), 416.1520c(a)).  "Instead, an ALJ is to consider all medical opinions in the record and 'evaluate their persuasiveness' based on the following five 'factors': (1) supportability, (2) consistency, (3) relationship with the claimant, (4) specialization, and (5) any 'other' factor that 'tend[s] to support or contradict a medical opinion.'"  *Id.* (quoting 20 C.F.R. §§ 404.1520c(a)–(c), 416 920c(a)–(c)).

Notwithstanding the requirement to "consider" all of these factors, the ALJ's duty to articulate a rationale for each factor varies.  20 C.F.R. §§ 404.1520c(a)–(b), 416 920c(a)–(b).  Under the new regulations, the ALJ must "explain how [he] considered" both the supportability and consistency factors, as they are "the most

important factors." 20 C.F.R. §§ 404.1520c(b)(2), 416.1520c(b)(2); *see also, e.g.,*

*Amber H. v. Saul*, No. 20-CV-490 (ATB), 2021 WL 2076219, at *4 (N.D.N.Y. May 24,

2021) (two "most important factors for determining the persuasiveness of medical

opinions are consistency and supportability," which are the "same factors" that

formed the foundation of the treating physician rule).  With respect to the

supportability factor, "the strength of a medical opinion increases as the relevance

of the objective medical evidence and explanations presented by the medical source

increase." *Vellone v. Saul*, No. 20-CV-261 (RA) (KHP), 2021 WL 319354, at *6

(S.D.N.Y. Jan. 29, 2021) (citing 20 C.F.R. §§ 404 1520c(c)(1), 416.920c(c)(1)), *adopted*

*sub nom. Vellone on behalf of Vellone v. Saul*, 2021 WL 2891138 (July 6, 2021).

Consistency, on the other hand, "is an all-encompassing inquiry focused on how well

a medical source is supported, or not supported, by the entire record." *Id.* (citing 20

C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2)); *see generally* 42 U.S.C. § 423(d)(5)(B)

(requiring ALJ to base decision on "all the evidence available in the [record]").

In addition, under the new regulations, the ALJ is required to consider, but

need not explicitly discuss, the three remaining factors (relationship with the

claimant, specialization, and other factors tending to support or contradict a

medical opinion).  *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). "Where,

however, the ALJ has found two or more medical opinions to be equally supported

and consistent with the record, but not exactly the same, the ALJ must articulate

how [he] considered those three remaining factors." *Velasquez*, 2021 WL 4392986,

at *20 (citing 20 C.F.R. §§ 404.1520c(b)(3), 416.920c(b)(3)).

Courts considering the application of the new regulations have concluded that "the factors are very similar to the analysis under the old [treating physician] rule." *Id.* (quoting *Dany Z. v. Saul*, 531 F. Supp. 3d 871, 885 (D. Vt. 2021)); *see also Acosta Cuevas v. Comm'r of Soc. Sec.*, No. 20-CV-502 (AJN) (KHP), 2021 WL 363682, at *9 (S.D.N.Y. Jan. 29, 2021) (report and recommendation) (collecting cases considering new regulations and concluding that "the essence" of the treating physician rule "remains the same, and the factors to be considered in weighing the various medical opinions in a given claimant's medical history are substantially similar").  "This is not surprising considering that, under the old rule, an ALJ had to determine whether a treating physician's opinion was *supported* by well-accepted medical evidence and *not inconsistent* with the rest of the record before controlling weight could be assigned."  *Acosta Cuevas*, 2021 WL 363682, at *9; *see also e.g., Andrew G. v. Comm'r of Soc. Sec.*, No. 19-CV-942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020) ("consistency and supportability" were foundation of treating physician rule); *Brianne S. v. Comm'r of Soc. Sec.*, No. 19-CV-1718 (FPG), 2021 WL 856909, at *5 (W.D.N.Y. Mar. 8, 2021) (remanding to ALJ with instructions to provide discussion of supportability and consistency of two medical opinions and explaining that ALJ may not merely state that examining physician's opinion is inconsistent with overall medical evidence).

Importantly, "an ALJ's failure to apply the correct legal standard constitutes reversible error if that failure might have affected the disposition of the case." *Lopez v. Berryhill*, 448 F. Supp. 3d 328, 341 (S.D.N.Y. 2020) (citing *Kohler*, 546 F.3d

at 265). However, the Court need not remand the case if the ALJ only committed harmless error, *i.e.*, where the "application of the correct legal principles to the record could lead only to the same conclusion." *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010) (alteration omitted) (citing *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987)).

### d. Claimant's Credibility

An ALJ's credibility finding as to the claimant's disability is entitled to deference by a reviewing court. *Osorio v. Barnhart*, No. 04-CV-7515 (DLC), 2006 WL 1464193, at *6 (S.D.N.Y. May 30, 2006). "[A]s with any finding of fact, '[i]f the Secretary's findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints." *Id.* (quoting *Aponte v. Sec'y of Health and Hum. Servs.*, 728 F.2d 588, 591 (2d Cir. 1984)). Still, an ALJ's finding of credibility "must . . . be set forth with sufficient specificity to permit intelligible plenary review of the record." *Pena*, 2008 WL 5111317, at *10 (internal quotation marks omitted) (quoting *Williams v. Bowen*, 859 F.2d 255, 260–61 (2d Cir. 1988)). "The ALJ must make this [credibility] determination 'in light of the objective medical evidence and other evidence regarding the true extent of the alleged symptoms.'" *Id.* (quoting *Mimms v. Heckler*, 750 F.2d 180, 186 (2d Cir. 1984)).

SSA regulations provide that statements of subjective pain and other symptoms alone cannot establish a disability. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010) (citing 20 C.F.R. § 404.1529(a)). The ALJ must follow a two-step

framework for evaluating allegations of pain and other limitations. *Id.* First, the ALJ considers whether the claimant suffers from a "medically determinable impairment that could reasonably be expected to produce" the symptoms alleged. *Id.* (citing 20 C.F.R. § 404.1529(b)). "If the claimant does suffer from such an impairment, at the second step, the ALJ must consider 'the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence' of record." *Id.* (citing 20 C.F.R. § 404.1529(a)). Among the kinds of evidence that the ALJ must consider (in addition to objective medical evidence) are:

> 1. The individual's daily activities; 2. [t]he location, duration, frequency, and intensity of the individual's pain or other symptoms; 3. [f]actors that precipitate and aggravate the symptoms; 4. [t]he type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; 5. [t]reatment, other than medication, the individual receives or has received for relief of pain or other symptoms; 6. [a]ny measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his back, standing for 15 to 20 minutes every hour, or sleeping on a board); and 7. [a]ny other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Peña*, 2008 WL 5111317, at *11 (citing Social Security Ruling ("SSR") 96–7p, 1996 WL 374186, at *3 (SSA July 2, 1996)).

## B. Analysis

Napolitano contends that the ALJ erred (1) in determining her RFC; (2) by according inadequate weight to the opinion of her treating physician; (3) by failing

to properly evaluate medical listing 11.05; and (4) in relying on the testimony of the vocational expert as it conflicted with the DOT.  Pl. Mem. at 11–15.  The Commissioner responds that the ALJ's decision should be affirmed because (1) substantial evidence supports the ALJ's RFC finding that she could frequently handle and finger; (2) Napolitano's impairments did not meet or equal a listed impairment; (3) the ALJ properly evaluated the medical evidence; and (4) no conflict existed between the VE's testimony and the DOT.  Def. Mem. at 12–24.  The Court addresses each issue in turn.

### 1.  The ALJ Correctly Determined Napolitano's RFC

Napolitano argues that the ALJ erred in assessing her RFC and finding that she could "frequently handle and finger with her bilateral upper extremities."  Pl. Mem. at 13.  She contends that the medical evidence and testimony demonstrate that she "can only occasionally handle, finger, and feel with her bilateral upper extremities."  *Id.*  Pointing to the medical evidence in the record reviewed by the ALJ, the Commissioner responds that Napolitano is mistaken.  Def. Mem. at 19.  Napolitano relatedly contends that the ALJ accorded inadequate weight to her treating physician.  Pl. Mem. at 14.  As discussed below, the ALJ accurately evaluated the medical evidence in the record, including the treating physician's opinion, and thus, based the RFC on substantial evidence.

### a.  The ALJ Properly Weighed the Opinion of the Treating Physician

Napolitano argues that the ALJ assigned inadequate weight to the opinion of her treating physician, Dr. Gary Rogg.  Pl. Mem. at 13.  However, under the new

regulations applicable here, the ALJ does not have to give any specific evidentiary
weight to the treating physician, but instead must evaluate all of the medical
evidence against the five applicable factors, discussed *supra* at 21–22, specifically
addressing supportability and consistency.  *See, e.g., Velasquez*, 2021 WL 4392986,
at *19–20.  Indeed, a "failure to assign weight does not undermine the ALJ's
decision."  *Kostick v. Kijakazi*, No. 21-CV-7107 (SLC), 2022 WL 4364771, at *8
(S.D.N.Y. Sep. 21, 2022) (cleaned up).

The ALJ evaluated the medical evidence under the supportability and
consistency standards and found Dr. Rogg's opinions to be persuasive in part and
unpersuasive in part.  AR at 18–19; *see Cruz v. Comm'r of Soc. Sec.*, No. 20-CV-9882
(OTW), 2023 WL 2207586, at *5 (S.D.N.Y. Feb. 24, 2023) (ALJ properly evaluated
medical record where she "explained her reasoning for accepting the well-supported
portions of [the physician's] opinion, while rejecting portions that were unsupported
by the record").  Specifically, on October 7, 2020, Dr. Rogg assessed Napolitano
using a Medical Source Statement of Ability To Do Work-Related Activities form
regarding her physical and mental abilities.  AR at 504–14.  The ALJ summarized
Dr. Rogg's report:

> [Napolitano] can never carry or lift any weight; and in an
> eight hour workday, can sit 2 hours, stand one hour and
> walk one hour, with no cane needed . . . . [She] can never
> reach, push or pull; but can occasionally handle, finger,
> feel and operate foot controls; is precluded from postural
> tasks; must avoid unprotected heights, operating a motor
> vehicle and moving machinery; is precluded from
> extremes of temperature, humidity and vibration; and
> requires a quiet environment . . . . [She] can travel alone,
> prepare a simple meal, climb a few steps at a reasonable

> pace and take care of personal hygiene; but cannot shop,
> walk a block at a reasonable pace or sort[,] handle[,] or
> use paper files.

*Id*. at 18 (citing *id*. at 510–14).

With respect to Napolitano's physical abilities, the ALJ correctly determined that Dr. Rogg's opinions "are not persuasive as they are not supported by treatment records [which indicate] no significant neurologic deficits, no gait, coordination or stance deficits, and negative imaging findings[,]" and her "restrictions to never performing postural activities and never being exposed to any environmental situations" are "not consistent with the objective findings or treatment history" nor with her own "reported abilit[ies]." *Id*.; s*ee, e.g., Acevedo v. Comm'r of Soc. Sec.*, No. 21-CV-10621 (KHP), 2023 WL 1433648, at *10 (S.D.N.Y. Feb. 1, 2023) (treating physician's opinion unpersuasive because it was not supported by own treatment notes nor consistent with other examiners' opinions); *Diaz v. Kijakazi*, No. 20-CV-10346 (JLC), 2022 WL 4352470, at *12 (S.D.N.Y. Sept. 20, 2022) ( "An ALJ has provided sufficient support to give a physician's opinion less weight where he observes that the conclusions are 'inconsistent with the moderate findings reflected in the [physician's] notes'") (quoting *Heaman v. Berryhill*, 765 F. App'x 498, 501 (2d Cir. 2019)).  Further, the ALJ found Dr. Rogg's opinion to be inconsistent with nurse practitioner Elizabeth Michell's "reports indicating that the claimant is restricted in physically strenuous activity, but is ambulatory and able to do work of light

nature." AR at 18 (citing AR at 378, 398).[7]  Notably, Dr. Rogg's conclusion that

Napolitano can never reach, push, or pull, is unsupported by her own hearing

testimony in which she admitted that reaching and, specifically, reaching overhead,

does not hurt.  *Id*. at 42–43.  Moreover, despite Dr. Rogg's claims that Napolitano

must avoid operating a motor vehicle, she testified that she is currently able to, and

does in fact, drive.  *Id*. at 38, 509; *see Acevedo*, 2023 WL 1433648, at *10 (plaintiff's

personal report that she uses public transportation, as well as physician's own

treating notes stating plaintiff is able to use public transportation, found to be

inconsistent with physician's conclusion that plaintiff has extreme limitation in

using public transportation).  The ALJ thus accurately observed that Dr. Rogg's

evaluation of Napolitano's physical abilities is "extreme and not consistent with any

of the evidence" and that Napolitano "has not shown a complete inability to perform

any activity."  AR at 18.

    With respect to Napolitano's mental abilities, Dr. Rogg reported that

Napolitano had moderate limitations in understanding and remembering complex

instructions and in her ability to make judgments on complex work-related

decisions.  *Id*. at 512–13.  Otherwise, he found that Napolitano had only mild

limitations in understanding and remembering simple instructions, in her ability to

make judgments on simple work-related decisions, in her ability to carry out

complex instructions, and in interacting with the public, supervisors, and co-

---

[7] The ALJ's decision and the Commissioner's papers spell Nurse Practitioner
Michell's name as "Mitchell."  However, it appears in the medical records as
"Michell."

workers. *Id.* The ALJ found these opinions to be persuasive as they were "[s]upported by the absence of mental status deficits in progress notes and consistent with the claimant's lack of mental health treatment" as well as "claimant's extensive activities of daily living." *Id.* at 18–19.

The ALJ thus properly evaluated the medical opinion of Dr. Rogg under the new regulations highlighting the supportability and consistencies found in the record, or lack thereof. Therefore, to the extent Napolitano disagrees with the ALJ's weighing of the evidence, "the deferential standard of review prevents [this Court] from reweighing it." *Krull v. Colvin*, 669 F. App'x 31, 32 (2d Cir. 2016). After all, substantial evidence requires only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Ferraro*, 806 F. App'x at 14 (quotation marks and citation omitted).

### b. The ALJ Properly Evaluated the Remaining Medical Opinions

In determining the RFC, the ALJ properly evaluated the remaining medical opinions in the record and assigned each the appropriate weight, identifying the supportability and consistency of each opinion as it relates to the record as a whole. *See Acevedo*, 2023 WL 1433648, at *12. Each opinion is discussed further below.

The ALJ considered the opinion of nurse practitioner Michell, who saw Napolitano from July 2018 through March 2019. AR at 15, 349–416. The ALJ noted that Michell reported that Napolitano's "[e]xaminations were benign, demonstrating intact extremity strength, sensation, motor function, ranges of motion, gait and coordination." *Id.* at 15 (citing *id.* at 354, 359, 378, 398). Although

Napolitano reported short-term memory and concentration problems since her surgery, throughout her visits, Michell consistently reported that Napolitano's "mood, affect, concentration[,] and attention were normal." *Id.* at 15 (citing *id.* at 354, 359, 378, 398). Michell found "no significant degenerative disease or nerve root compression," but observed that Napolitano continued to report neuropathic pain around the place of incision and in her right foot and right hand. *Id.* at 351, 353. Michell consistently concluded that Napolitano was "restricted in physically strenuous activity, ambulatory and able to do work of light nature," with the ability "to carry on normal activity," and only "minor signs or symptoms of disease." *Id.* at 358–59, 378, 398. The ALJ found that although Michell's opinions were "somewhat vague," they were "generally persuasive as [they were] supported by her own progress notes." *Id.* at 19. The ALJ's decision makes clear that Michell's evaluations are supported by her own treatment records throughout her visits with Napolitano, and Michell's ultimate conclusion of "work of light nature" is consistent with the record as a whole.

The ALJ next considered the opinion of state agency consultant Dr. Julia Kaci as a result of a consultative examination on November 20, 2019. *Id.* at 16, 416–21. Dr. Kaci opined that while Napolitano reported daily headaches, vertigo, generalized fatigue and neuropathy to the hands and feet, she nevertheless was able to cook three to four times a week, clean once or twice a week, shop and do laundry once a week, and socialize with friends. *Id.* at 417–18. Dr. Kaci further observed that Napolitano maintained a normal stance but could only squat halfway

due to her lack of balance. *Id*. at 418. Although Napolitano presented with a "slightly unbalanced" gait, she required no assistance in changing for the exam, "getting on and off [the] exam table," or rising from a chair. *Id*. at 418–19. The ALJ additionally referred to Dr. Kaci's report that Napolitano had "no restriction in motion to the extremities or cervical spine," and only had "mildly reduced 4+/5 strength to the extremities" with "no sensory deficit" and "intact hand/finger dexterity with full grip strength." *Id*. at 16 (citing *id*. at 419–20). The ALJ summarized Dr. Kaci's conclusion that Napolitano had "moderate limitations to any heavy lifting, carrying, pushing, pulling, squatting, and bending; and should avoid bright lights, noisy environments[,] unprotected heights[,] and uneven surfaces." *Id*. at 16 (citing *id*. at 420). The ALJ found the opinion of Dr. Kaci to be "persuasive" as it is "consistent with the examination findings indicating some balance issues but generally normal neurologic testing, except to mildly reduced strength[,]" and is "supported by progress notes documenting visits for headaches and neuropathic pain, but also noting a normal gait, and the absence of focal deficit." *Id*. at 16.

The ALJ then considered the opinions of state agency physicians Dr. Putcha and Dr. Periakaruppan, who evaluated Napolitano on January 16, 2020 and May 6, 2020, respectively. *Id*. at 19, 94–95, 98, 112, 116.[8] The ALJ noted that Dr. Putcha determined Napolitano had the ability for "light exertion with frequent postural abilities" and should "avoid concentrated noise, vibration[,] and hazards." *Id*. at 19

---

[8] The record does not indicate the full names of Drs. Putcha or Periakaruppan.

(citing *id.* at 93–94, 98).  In contrast, the ALJ compared Dr. Periakaruppan's

opinion that Napolitano is capable of "sedentary exertion" with "occasional stairs

and postural abilities and no ladders or exposure to concentrated noise, vibration[,]

and hazards."  *Id.* at 19 (citing *id.* at 110–11, 115).  The ALJ found Dr. Putcha's

opinion only partially persuasive in that the more recent medical record actually

supported a more restrictive RFC than the "light exertion" that Dr. Putcha had

opined.  *Id.* at 19.  In contrast, the ALJ found persuasive Dr. Periakaruppan's

opinion of "sedentary exertion" as it was supported by and consistent with the

opinions of Dr. Kaci and Nurse Practitioner Michell.  *Id.*  The ALJ's assessment

here is consistent with well-established law that an "ALJ is free to reject portions of

medical-opinion evidence not supported by objective evidence of record, while

accepting those portions supported by the record."  *Lisa T. v. Comm'r Soc. Sec.*, No.

21-CV-469 (DB), 2023 WL 203363, at *5 (W.D.N.Y. Jan. 17, 2023) (citation omitted).

The ALJ next analyzed the opinion of Dr. Melissa Antiaris, Psy. D, who

evaluated Napolitano on November 20, 2019.  AR at 16–17, 422–27.  In her

consultative examination, Dr. Antiaris found that Napolitano had "no limitations in

[her] ability to understand, remember, or apply simple directions and

instructions[,]. . . to use reason and judgment to make work-related decisions, or

interact adequately with supervisors, co-workers, and the public."  *Id.* at 425.  Dr.

Antiaris further observed that Napolitano had "no limitations in [her] ability to

sustain an ordinary routine and regular attendance at work."  *Id.*  However, Dr.

Antiaris ultimately opined that Napolitano is "*markedly* limited in her ability to

sustain concentration and perform a task at a consistent pace[,] . . . to regulate
emotions, control behavior, and maintain well-being." *Id.* (emphasis added).  The
ALJ found these statements to be "[i]nconsistent with the claimant's ability to drive,
manage her funds, cook and shop," and thus, "the marked limits appear to be an
overestimate given claimant's overall functioning." *Id.* at 17.  Additionally, Dr.
Antiaris found that Napolitano had "moderate limitations in [her] ability to
understand, remember, or apply complex directions and instructions" but "no
limitations in [her] ability to maintain personal hygiene, or be aware of normal
hazards." *Id.* at 425–26.  The ALJ correctly determined Dr. Antiaris's opinion to be
unpersuasive in that the results of the "one-time examination . . . [were] not
consistent with the claimant's lack of mental health treatment and . . . not
supported by the medical evidence of record indicating normal mental status
findings." *Id.* at 17.  Where a physician's conclusion of a marked limitation conflicts
with the physician's own examination results finding only mild limitations, it is
proper for the ALJ to find the opinion not persuasive and not supported by the
record.  *See, e.g., Cruz*, 2023 WL 2207586, at *4.

Lastly, the ALJ considered the opinions of state agency psychologists, Dr. J.
Ochoa and Dr. H. Ferrin.  *Id.* at 19, 90, 97.[9]   Dr. Ochoa evaluated Napolitano on
January 14, 2020 and found she was mildly limited in her ability to "adapt or
manage [her]self" and moderately limited in "understand[ing], remember[ing], or
apply[ing] information," "interact[ing] with others," and "concentrat[ing],

---

[9] The record does not indicate the full names of Drs. Ochoa and Ferrin.

persist[ing], or maintain[ing] pace." *Id.* at 90.  Dr. Ochoa additionally found the

opinions of Dr. Antiaris related to Napolitano's marked limitations "to be an

overestimate given claimant's overall functioning." *Id.* at 97.  Dr. Ochoa concluded:

> The totality of the evidence indicates the claimant can
> understand and remember detailed instructions and
> procedures, is able to maintain adequate attention to
> complete ordinary work tasks on an ongoing basis and is
> able to independently sustain a routine over time, interact
> appropriately to meet work needs, and adapt to work
> related changes and make work related decisions.

*Id.*  Dr. Ferrin evaluated Napolitano on May 19, 2020 and recorded the same

limitations with the same ultimate conclusion as Dr. Ochoa.  *Id.* at 107–08, 114.

The ALJ found their opinions to be persuasive as "[t]hey are supported by the

generally benign mental status examination findings and are consistent with

[Napolitano's] lack of mental health treatment and her activities of daily living." *Id.*

at 19.  Thus, the ALJ correctly assessed the opinions of Dr. Ferrin and Dr. Ochoa

under the substantial evidence standard given the overall medical findings,

physician's reports, and Napolitano's testimony.  *See, e.g., Cruz*, 2023 WL 2207586,

at *5.

In sum, the ALJ's analysis of the record is supported by substantial evidence.

Where the ALJ "did not err in weighing the opinions of the various treating and

non-treating doctors" and where the ALJ provided "sufficient . . . reasons for [his]

conclusions about this evidence," the ALJ properly evaluated the medical evidence

as a whole.  *Acevedo*, 2023 WL 1433648, at *12.

35

### c. The ALJ's RFC Determination was Based on Substantial Evidence in the Record

The ALJ found that Napolitano has the RFC to:

> perform sedentary work[;] can occasionally climb ramps and stairs, but cannot climb ladders[,] ropes[,] or scaffolds[;] can occasionally balance, stoop, crouch, crawl, or kneel[;] must avoid unprotected heights and hazardous machinery[;] must avoid bright lights[;] can frequently handle and finger with the bilateral extremities[;] can frequently operate bilateral foot controls[;] can be exposed to no more than a moderate noise level[;] can understand, remember and carry out simple, routine[,] repetitive work[-]related tasks.

*Id.* at 14 (cleaned up).

In challenging this finding, Napolitano first argues that the ALJ incorrectly concluded that she could *frequently* handle and finger with her bilateral upper extremities because her treating physician had stated that she could only *occasionally* handle and finger. Pl. Mem. at 13. Though the ALJ does not need to assign particular weight to the treating physician's opinion, the "long-term nature of a treating physician's relationship with the patient is clearly relevant and must be considered when weighing the opinions and determining an RFC." *Acevedo*, 2023 WL 1433648, at *10. In determining Napolitano's RFC, the ALJ considered the entire record, including the opinions of her treating physician, as well as the nurse practitioner, the consultative examiners, and Napolitano's subjective reports, within the relevant time period. An ALJ's evaluation "need not 'perfectly correspond with any of the opinions of medical sources cited in [his] decision,' because the ALJ is 'entitled to weigh all of the evidence available to make an RFC finding that [i]s

36

consistent with the record as a whole." *Lisa T.*, 2023 WL 203363, at *5 (quoting *Matta v. Astrue*, 508 F. App'x 53, 56 (2d Cir. 2013) (citing *Richardson v. Perales*, 402 U.S. 389, 399 (1971))).

 As discussed above, the ALJ reasonably found Dr. Rogg's opinion with respect to Napolitano's physical abilities to be unpersuasive as it was not supported by overall treatment records, not consistent with the objective findings or treatment history, and not consistent with Napolitano's own reported ability to drive, shop, cook, and clean.  AR at 18; *see Tamara M. v. Saul*, No. 19-CV-1138 (CFH), 2021 WL 1198359, at *11 (N.D.N.Y. Mar. 30, 2021) (no error where ALJ "merely declined to include limitations to support the marked limitations [the physicians] opined as he concluded that such limitations were not supported by the medical record").  Indeed, the ALJ commented that while Dr. Rogg's "general ideas" of Napolitano's limitations were considered in evaluating her RFC, "the degree alleged is extreme and not consistent with any of the evidence."  AR at 18.

 Further, the ALJ observed that Dr. Rogg had prescribed Gabapentin for Napolitano's neuropathic pain, but Napolitano later admitted to not taking the Gabapentin as recommended.  *Id*. at 15, 355.  An ALJ may consider a "plaintiff's non-adherence to treatment suggestions, like . . . pain management" when determining the RFC.  *Gonzalez v. Comm'r of Soc. Sec.*, No. 21-CV-800 (VB) (JCM), 2022 WL 3348386, at *14 (S.D.N.Y. May 27, 2022), *adopted sub nom. Gonzalez v. Kijakazi*, 2022 WL 3348525 (Aug. 12, 2022); *see also Taylor v. Chater*, No. 94-CV-5197 (JSM), 1995 WL 694466, at *6 (S.D.N.Y. Nov. 22, 1995) (ALJ considered

plaintiff's avoidance of treatment and discontinuance of physical therapy when assessing plaintiff's subjective allegations of disabling pain).  Likewise, "[a] claimant's adherence to treatment once it is prescribed is a pertinent factor in evaluating the credibility of claimant's statements concerning the intensity, persistence[,] and limiting effects of his pain or other symptoms."  *Kuchenmeister v. Berryhill*, No. 16-CV-7975 (HBP), 2018 WL 526547, at *18 (S.D.N.Y. Jan. 19, 2018). Accordingly, the ALJ appropriately considered this admission in evaluating the severity of Napolitano's limitations when determining her RFC.

Second, Napolitano points to Dr. Kaci's observations that she has "reduced muscle strength of the upper extremity."  Pl. Mem. at 13.  However, Dr. Kaci only found *mildly* reduced (*i.e.* over four out of five) strength to the extremities, as well as no sensory deficit, intact hand/finger dexterity, and full grip strength.  AR at 418–20.  Consistent with this opinion, as the ALJ noted, nurse practitioner Michell found that Napolitano had "intact extremity strength, sensation, motor function, ranges of motion, gait and coordination," and the ability to perform "work of light nature."  *Id.* at 15–16 (citing *id.* at 378, 398).

Third, Napolitano highlights an additional determination by Dr. Kaci that she has "moderate limitations to any heavy lifting, carrying, pushing[,] or pulling."  Pl. Mem. at 13 (citing AR at 420).  However, in determining that Napolitano was capable of "sedentary work" as defined in 20 C.F.R. § 404.1567(a), the ALJ did in fact incorporate Dr. Kaci's moderate limitation finding.  *See, e.g., Rodriguez v. Barnhart*, No. 01-CV-7373 (SAS), 2002 WL 31307167, at *5 (S.D.N.Y. Oct. 15, 2002)

(RFC for sedentary work, less restrictive requirement, incorporates moderate limitation in lifting). As Dr. Kaci's opinion is in line with the ALJ's RFC determination, Napolitano's argument lacks merit.

In sum, there is substantial evidence in the record to support the ALJ's determination of Napolitano's RFC and that she "is capable of performing a wide range of sedentary work." AR at 14–15.

### 2. The ALJ Properly Evaluated Medical Listing 11.05

Napolitano argues that the ALJ erred by failing to properly evaluate medical Listing 11.05 and remand is warranted for further evaluation of her impairments that meet or equal the severity of a listed impairment in 20 C.F.R. 404 Subpart P, Appendix 1. Pl. Mem. at 12–13. The Commissioner responds that substantial evidence supports the ALJ's step three finding that Napolitano's impairments did not meet or equal Listing 11.05, or any other listed impairment. Def. Mem. at 18.

To meet the requirements of a Listing, "claimants must 'meet all of the specified medical criteria [therein]. An impairment that manifests only some of those criteria, no matter how severely, does not qualify.'" *Ayala v. Kijakazi*, No. 20-CV-09373 (RWL), 2022 WL 3211463, at *13 (S.D.N.Y. Aug. 9, 2022) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Additionally, "where . . . the ALJ only cursorily mentions a particular Listing without providing more than boilerplate analysis, there is no error if the ALJ's determination is otherwise supported by substantial evidence in the record." *Id.*; *see also Thorne v. Comm'r of Soc. Sec.*, No. 20-CV-6513 (OTW), 2023 WL 579524, at *3 (S.D.N.Y. Jan. 27, 2023) ("An ALJ is not

required to explicitly state their rationale for determining whether the plaintiff meets a listing, so long as the rest of the decision and the record indicate that the determination is supported by substantial evidence.") (citing *Salmini v. Comm'r of Soc. Sec.*, 371 F. App'x 109, 112 (2d Cir. 2010)).

To meet Listing 11.05, a claimant must demonstrate:

> (A) Disorganization of motor function in two extremities, resulting in an extreme limitation in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or
>
> (B) Marked limitation in physical functioning, and in one of the following: (1) Understanding, remembering, or applying information; or (2) Interacting with others; or (3) Concentrating, persisting, or maintaining pace; or (4) Adapting or managing oneself.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 11.05.  A marked limitation is defined as a *seriously limited ability* to function independently, appropriately, and effectively on a sustained basis.  *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00.  An extreme limitation is defined as the *inability* to function independently, appropriately, or effectively on a sustained basis.  *Id.*  Further, "it is not enough that scattered portions of the record might support certain of the required elements of a listing. Rather [Napolitano] must show that [s]he meets all the requirements of the listing consistently."  *Flores v. Comm'r of Soc. Sec.*, No. 21-CV-8109 (RWL), 2022 WL 17496235, at *8 (S.D.N.Y. Dec. 8, 2022) (cleaned up).  Specifically, "[Napolitano] has the burden of showing that [s]he met each of the elements of a listing for a continuous period of 12 months."  *Id.* (citation omitted); *see* 20 C.F.R. § 404.1509. Moreover, an ALJ will not "substitute a claimant's allegations of pain or other

symptoms for a missing or deficient sign or laboratory finding to raise the severity of the impairments to that of a listed impairment." *Flores*, 2022 WL 17496235, at *8 (cleaned up).

The *Flores* court found that where the claimant alleged "on and off" lower back pain for years, denied treatment throughout those years, and the medical evidence contradicted claimant's allegations, the claimant did not meet the continuous listing requirement. 2022 WL 17496235, at *9. Similarly, here, although Napolitano complained of neuropathy, migraines, and anxiety since her surgery, her benign medical examinations from various physicians, nonadherence to taking the prescribed Gabapentin, and her lack of mental health treatment do not lend themselves to satisfying the Listing's requirements. Napolitano provided no evidence that she maintains an extreme limitation in any capacity to support meeting Listing 11.05(A).

In this case, the ALJ's determination that Napolitano did not meet the requisite elements of Listing 11.05 for the period since August 1, 2018 is supported by substantial evidence. In finding that there is no evidence of disorganization of motor functioning or marked limitations in physical and mental functioning, the ALJ considered the supportability and consistency of each physician's evaluation. *Id*. at 10–21. Dr. Antiaris was the only physician to have reported any marked limitations—in Napolitano's "ability to sustain concentration and perform a task at a consistent pace[,] and in her ability to regulate emotions, control behavior, and maintain well-being." *Id*. at 16–17 (citing *id*. at 425–26). The ALJ reasonably

41

found this opinion to be unpersuasive as it is neither supported nor consistent with Napolitano's medical evidence, her lack of mental health treatment, or her daily activities. *See Tamara M.*, 2021 WL 1198359, at *11 (marked limitations unsupported by medical record and not included in RFC).[10]

Moreover, Napolitano did not provide any authority to support her contention that the ALJ erred in making his determination, but merely recited the same medical evidence that the ALJ had evaluated in making his decision.  Pl. Mem. at 12.  Because Napolitano "contends that the entirety of the record supports a finding that [s]he was incapable of performing sedentary work[ and] fails to cite to any specific evidence that supports h[er] contention[, t]his fact alone could constitute substantial evidence supporting a denial of benefits." *Whitmore v. Kijakazi*, No. 20-CV-8435 (SN), 2022 WL 976964, *11 (S.D.N.Y. Mar. 31, 2022) ("A lack of supporting evidence on a matter for which the claimant bears the burden of proof, particularly when coupled with other inconsistent record evidence, can constitute substantial evidence supporting a denial of benefits.") (citing *Barry v. Colvin*, 606 F. App'x 621, 622 (2d Cir. 2015)).  The ALJ thus accurately determined, under the totality of the circumstances, that "no acceptable medical source designated to make equivalency

---

[10]  Napolitano's reported improvement in her overall mood when taking anti-depressant medication, improvement in neuropathic pain when taking Gabapentin, improvement in headaches and vertigo, and resolved pain in her left foot further cuts against Dr. Antiaris' opinion of a marked limtiation.  *See* AR at 15, 309, 356, 395, 399, 478, 502; *see also, e.g., Lisa T.*, 2023 WL 203363, at *7 (physician's opinion unpersuasive when it conflicts with plaintiff's reported improvements with medication).

findings has concluded that the claimant's impairments medically equal a listed impairment." AR at 13.

### 3.   The ALJ Accurately Relied on the VE's Testimony

Napolitano's final argument is that the ALJ erred in crediting the VE's testimony because, she alleges, it conflicted with the DOT. Pl. Mem. at 15. The Commissioner counters that there is no conflict between the VE's testimony and the DOT, and Napolitano has provided no authority to support her contention. Def. Mem. at 23.

The ALJ accurately relied on the VE's testimony that an individual with Napolitano's vocational profile and RFC for sedentary work with the added limitations of simple, routine, and repetitive work-related tasks, could perform the three jobs identified: document preparer, clerk for customer service, and information clerk. *Id*. at 52. At the hearing, the ALJ appropriately asked the VE whether there were any inconsistencies or conflicts between her testimony and the DOT. *Id*. at 53. The VE confirmed that the descriptions of "less than sedentary" (referring to the two hours of sitting, one hour of walking, and one hour of standing in an eight-hour workday) and "off task" (referring to the percentage a person would be off-task in an eight-hour workday) in the hypothetical are not addressed in the DOT, but rather are based on her professional opinion. *Id*. Otherwise, "[e]verything else is addressed in the DOT." *Id*. Without citing to any authority, Napolitano argues that the jobs identified by the VE "have little opportunity for

43

diversion or interruption and are not routine and repetitive." *Id.* Napolitano's argument is without merit.

Under a 2000 Social Security Administration Policy Interpretation Ruling (the "Ruling"), the Commissioner may rely on the DOT *and* the VE's testimony for information about a particular job's requirements when determining whether that job can accommodate a claimant's physical limitations. *See, e.g., Lockwood v. Comm'r of Soc. Sec. Admin.*, 914 F.3d 87, 91 (2d Cir. 2019). Further, it is the "Commissioner's duty to identify and resolve apparent conflicts between [the DOT] and [the VE's] testimony." *Id.* at 93 (cleaned up); *see* SSR 00-4p, 2000 WL 1898704, at *4.

Napolitano's limitations meet the demands of the recommended jobs provided in the DOT. The DOT describes all three of the representative occupations as having a reasoning level of 3 ("R-3") and a specific vocational preparation level of 2 ("SVP-2"). *See* DOT 237.367-046 (Telephone Quotation Clerk); 205.367-014 (Charge-Account Clerk); 249.587-018 (Document Preparer, Microfilming). Courts in this Circuit agree that "scores [of SVP-2] assigned to the representative occupations by the DOT are consistent with the ability to perform simple, low-stress, unskilled work." *Sharone D.P. v. Comm'r of Soc. Sec.*, 21-CV-1030 (GRJ), 2023 WL 1966179, *5 (S.D.N.Y. Feb. 13, 2023) (no conflict between VE's testimony and DOT where RFC limited plaintiff to simple, routine, and repetitive tasks, and DOT occupations required SVP-2); *see also Martinez v. Comm'r of Soc. Sec.*, No. 15-CV-3649 (RRM), 2017 WL 1155778, at *17 (E.D.N.Y. Mar. 27, 2017) (no inconsistency between DOT

and VE testimony); *Cross v. Astrue*, No. 08-CV-0425 (VEB), 2009 WL 3790177, at *8
(N.D.N.Y. Nov. 12, 2009) (no error where ALJ found RFC to perform SVP–2).
Further, "a growing number of courts have held that jobs with DOT reasoning levels
of two or three are compatible with limitations to simple, routine work." *Haiss v.
Berryhill*, No. 17-CV-8083 (VB) (LMS), 2019 WL 3738624, at *11 (S.D.N.Y. May 15,
2019) (ALJ's RFC determination limiting plaintiff to simple, routine tasks not
inconsistent with DOT requiring reasoning level of three), *adopted sub nom. Haiss
v. Comm'r of Soc. Sec.*, 2019 WL 5690712 (S.D.N.Y. Nov. 4, 2019); *see also Jolean*,
2022 WL 595361, at *12–13 (where claimant was limited to "simple instructions"
and DOT representative occupations required R-3, there was no conflict, and ALJ
did not err by failing to inquire whether simple instructions restriction would
comply with R-3.).

Here, the ALJ did not inquire further into Napolitano's *alleged* conflict
between the VE's testimony and the DOT concerning Napolitano's limitations of
requiring "routine and repetitive" work-related tasks. However, he need not have
inquired because there *was no* apparent conflict between the VE's testimony and
the DOT. Further, Napolitano has no basis for arguing that the representative
occupations do not tolerate the need for simple, routine, and repetitive tasks when
the case law identifies reasoning levels of three as meeting the requirements of
simple and routine. *See, e.g., Haiss*, 2019 WL 3738624, at *11. Accordingly, the
ALJ properly relied on the VE's testimony when identifying the three jobs that exist
in the national economy that Napolitano can perform.

### III. CONCLUSION

For the foregoing reasons, Napolitano's motion for summary judgment is denied, and the Commissioner's cross-motion is granted.

The Clerk is directed to mark the motion at Docket Number 13 as "denied" and the motion at Docket Number 20 as "granted," and enter judgment for the Commissioner.

**SO ORDERED.**

Dated: May 2, 2023
       New York, New York

JAMES L. COTT
United States Magistrate Judge

46